## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

In re:                                   :            Case No. 25-30191
      The Bellevue Hospital        :            Chapter 11
                                         :
          Debtor.              :            Judge Mary Ann Whipple

### MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE ASSUMPTION OF THE RESTRUCTURING SUPPORT AGREEMENT, (B) APPROVING BID PROCEDURES AND SCHEDULING AN AUCTION, AND (C) GRANTING RELATED RELIEF

The Bellevue Hospital, debtor and debtor in possession (the "Debtor"), hereby moves the Court for entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), (a) authorizing the Debtor to assume the *Restructuring Support Agreement*, dated as of February 5, 2025 (the "Restructuring Support Agreement" or "RSA")[1], attached hereto as Exhibit B, by and among (i) the Debtor, (ii) Fifth Third Bank, National Association ("Fifth Third"), in its capacity as bond holder, issuer of credit cards, and depository bank, (iii) The Bank of New York Mellon Trust Company, N.A. (the "Master Trustee" and, together with Fifth Third, the "Senior Secured Creditor"), in its capacity as Master Trustee, and (iv) Firelands Regional Health System ("Firelands") in its capacity as secured lender, membership interest holder, and purchaser (collectively, the "Parties"), (b) approving certain procedures to elicit possible Alternative Transaction Proposals and scheduling an auction, if necessary, and (c) granting such other relief as is just and proper.

A memorandum in support follows. The Debtor is separately filing a motion to shorten the response time for this motion pursuant to Bankruptcy Rule 9006(c) and therefore has not included a 14-day notice with this filing. Notice will be separately provided.

---

[1] Unless otherwise defined herein, capitalized terms shall have the same meaning as ascribed to them in the RSA.

25-30191-maw    Doc 75    FILED 02/10/25    ENTERED 02/10/25 23:29:54    Page 1 of 49

Respectfully submitted,

/s/ Richard K. Stovall

Thomas R. Allen      (0017513)
Richard K. Stovall    (0029978)
James A. Coutinho    (0082430)
Andrew D. Rebholz   (0102192)
Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Suite 2400
Columbus, OH 43215
allen@asnalaw.com; stovall@asnalaw.com
coutinho@asnalaw.com; rebholz@asnalaw.com
*Proposed Counsel for Debtor*

**MEMORANDUM IN SUPPORT**

## I.       PRELIMINARY STATEMENT

1.       After months of extensive, arms-length, multi-party negotiations, the Debtor entered into the RSA with Firelands, and the Senior Secured Creditor, who has claims against the Debtor in excess of $17 million. The RSA establishes the framework and support for a plan of reorganization that will dramatically deleverage the Debtor's significant financial obligations and provide new support for the Debtor's operations through a membership substitution or sale of its assets, subject to higher and better offers. With the support of its Senior Secured Creditor and Firelands, the RSA paves the way for a reorganization that will allow the Debtor to exit chapter 11 expeditiously—thereby preserving its business operations—and provides the best available opportunity for the Debtor to maximize the value of its estate.

2.       The assumption of the RSA ensures that the agreement forming the foundation of the Debtor's reorganizational efforts continues to be valid and enforceable against all signatories, and continues to provide the Debtor with the benefits it bargained for thereunder, including a DIP facility, the ability to use cash collateral, and an opportunity for all stakeholders to maximize recoveries while permitting the Debtor's operations to proceed swiftly towards confirmation and emergence from bankruptcy as a financially-healthy hospital.

3.       In summation, the Debtor's assumption of the RSA is a sound exercise of its business judgment, and the Court should authorize the Debtor's assumption of the RSA.

## II.      JURISDICTION & BACKGROUND INFORMATION

4.       This Court has jurisdiction over this application under 28 U.S.C. §§ 157 and 1334 and the General Order of Reference entered in this District.

5.        Venue is proper under 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

6.        On February 5, 2025 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The Debtor continues to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.        The factual background regarding the Debtor, including its business operations, its capital and debt structure, and the events leading to the filing of this chapter 11 case, is set forth in detail in the Declaration of Sara K. Brokaw (the "Brokaw Declaration") (Doc. 35) and the Declaration of Darrell M. Lentz (the "Lentz Declaration" and, along with the Brokaw Declaration, the "First Day Declarations") (Doc. 36). The First Day Declarations are incorporated herein by reference.

## III.    THE RESTRUCTURING SUPPORT AGREEMENT

8.        On February 5, 2025, the Debtor entered into the RSA with its Senior Secured Creditor and Firelands. The RSA establishes the framework through which the Debtor seeks to reorganize its financial affairs. The RSA provides the Debtor with a DIP facility and the ability to utilize certain cash collateral, thus enabling the Debtor to maintain its business operations during this chapter 11 proceeding.

9.        The RSA sets forth certain milestones (the "Milestones") that guide the pace and direction of the Debtor's bankruptcy proceeding. *See* RSA, § 3. These agreed-upon Milestones are set forth as follows:

    a.        No later than February 5, 2025, the Debtor would file its voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code;

b.     No later than one business (1) day after that Petition Date, Debtor would file a motion seeking entry of a DIP Financing Order (as defined in the RSA) and also file an application to retain and employ Juniper Advisory, LLC ("Juniper"), as its investment banker;

c.     No later than two business (2) days after the Petition Date, the Debtor would file this motion seeking approval for the Debtor to assume the RSA, which motion also contains proposed sale and bid procedures for the marketing of the Debtor's business and assets;[2]

d.     No later than four (4) business days after the Petition Date, the Debtor would file a motion seeking approval of certain procedures to guide the confirmation of its plan;

e.     No later than February 10, 2025, the Court will have entered the DIP Financing Order on an interim basis;

f.     On or before February 14, 2025, the Debtor and Firelands will execute a membership substitution agreement (the "MSA"), providing for Firelands' acquisition of 100% of the membership interests in TBH for a consideration equal to the amount necessary to (i) provide cash payment of $15,000,000 to Senior Secured Creditor (the "**Cash Payment**"); and (ii) satisfy any other monetary and non-monetary obligations of TBH to satisfy all requirements for confirmation of the plan as part of a $15,000,000 capital commitment to TBH (collectively with the Cash Payment, the "**<u>Acquisition Price</u>**");

g.     No later than 14 days after the Petition Date, the Debtor shall file its plan and disclosure statement, as well as any other documentation necessary to completing the Debtor's restructuring under the RSA;

h.     By February 20, 2025, the Court will have entered an order assuming the RSA;

i.     By February 28, 2025, the Court will have entered the DIP Financing Order on a final basis; and, to the extent applicable, an order approving the Debtor's disclosure statement and any supporting solicitation materials;

j.     By April 11, 2025, the Court shall have entered an order confirming the Debtor's plan; and

k.     By April 25, 2025, the Debtor's plan shall become effective.

---

[2] By agreement of the Parties, this deadline has been extended to three (3) business days following the Petition Date.

10.    The Debtor submits that, as of the filing of this motion, it is in compliance with the Milestones thus far, having timely (i) filed its petition on February 5, 2025 (Doc. 1), (ii) filed its motion for the entry of a DIP Financing Order (Doc. 34), and (iii) filed its application to employ Juniper as its investment banker (Doc. 21).

11.    The RSA also outlines the respective commitments of the Parties. *See* RSA, § 4. Firelands, for example, agrees to cooperate and coordinate with the Debtor throughout this case, and to commit to acquire 100% of the membership interest of the Debtor through the terms of the MSA, as it is described in the RSA. *Id*. at §§ 4(a)(1) & (8).

12.    Further, Firelands agrees to provide post-petition financing to the Debtor, as set forth in the "DIP Financing Term Sheet" attached as Exhibit A to the RSA. *Id*. at § 4(a)(9); also see Doc. 34. The Debtor submits and acknowledges that this post-petition financing will be critical to the continued operations of the Debtor throughout this bankruptcy proceeding.

13.    The Senior Secured Creditor also agrees to cooperate and work with the Debtor during this proceeding. *Id*. at § 4(b)(1). Part of this cooperation involves consenting to the Debtor's use of cash collateral on the terms set forth in the DIP Financing Term Sheet. *Id*. at § 4(b)(8); also see Doc. 34.

14.    Further, the Senior Secured Creditor agrees and consents to the release of all liens it holds in the Debtor's collateral, at the effective date of the Debtor's plan, upon receipt of $15,000,000 from the acquisition proceeds. *Id*. at § 4(b)(9).

15.    In the event that a higher bidder ultimately acquires the Debtor's assets or membership interests in the Debtor through the procedure set forth in the RSA, the RSA also provides for a "Stalking Horse Fee" to Firelands in "an amount equal to the reasonable out-of-

6

pocket expenses incurred by Firelands, including reasonable attorneys' fees" from the proceeds of that higher bid, "not to exceed $600,000". *See Id*. at § 8.

## IV.     RELIEF REQUESTED

### A.     The Debtor should be authorized to assume the RSA

16.     The Debtor's entry into the RSA was an exercise of its sound business judgment, as is the decision to assume it. As such, the Court should authorize the Debtor to assume the RSA.

17.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The assumption of a contract by a debtor is subject to review under the business judgment standard. *See In re Federated Dept. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases."), citing *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984). If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of the executory contract or unexpired lease. *See id*.; *see also Grp. of Institutional Investors v. Chicago, M., St. P. & P. R. Co.*, 318 U.S. 523, 550-551 (1943); *In re BX Acquisitions, Inc.*, 588 B.R. 798, 809 (Bankr. N.D. Ohio 2018) ("A debtor-in-possession's decision to assume an executory contract has been subject to a 'business judgment' standard…").

18.     The business judgment rule shields a debtor's management from second-guessing by the courts. *See BX Acquisitions*, 588 B.R. at 809, citing 3 Collier on Bankruptcy, ¶ 365.03[2] at 365-26-27 (16th Ed. 2018) ("…the court should focus on the business judgment of the…debtor in possession, not on its own business judgment."); *see also In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 463 (Bankr. S.D. N.Y.), citing *In Johns-Manville Corp.*, 60 B.R. 612, 615-616

(Bankr. S.D. N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D. N.Y. 1992); *see also Granada Invs., Inc. v. DWG Corp.*, 823 F. Supp. 448, 454 (N.D. Ohio 1993) (observing that "courts employ the business judgment rule because in order for a corporation to be managed properly and efficiently, latitude must be given in the handling of corporate affairs").

19.     In applying the "business judgment" standard, debtors are usually given significant discretion when requesting to assume or reject an executory contract or unexpired lease. *See In re LATAM Airlines Group S.A.*, 2022 WL 790414, at *31 (Bankr. S.D. N.Y. Mar. 15, 2022), citing *In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D. N.Y. 1997) ("[A] court will ordinarily defer to the business judgment of the debtor's management"); *In re Chipwich, Inc.*, 54 B.R. 427, 430-431 (Bankr. S.D. N.Y. 1985) (finding that a court should not interfere with a debtor's decision to assume or reject "absent a showing of bad faith or abuse of business discretion"). Further, the "business judgment" standard merely requires debtors to establish that the requested assumption will benefit the estate. *See In re ASPC Corp.*, 601 B.R. 766, 809 (Bankr. S.D. Ohio 2019), citing *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4. 53d 1095, 1099 (2d Cir. 1993) (the court must "determine if it would be beneficial or burdensome to the estate" for the debtor to assume the contract).

8

20.     Indeed, courts have typically approved the assumption of prepetition restructuring support agreements in comparable cases.[3]

21.     Assumption of the RSA satisfies the business judgment test. The RSA is the result of extensive, arm's length negotiations between the Debtor, Firelands, and the Senior Secured Creditor, with all parties represented by sophisticated counsel. The terms of the RSA reflect significant concessions from all signatory parties. The agreement embodied by the RSA has the support of the Senior Secured Lender who holds over $17 million of the claims under the pre-petition credit facilities of the Debtor.

22.     In addition, the enhanced liquidity resulting from the Senior Secured Lender's consent to the Debtor's use of cash collateral without a protracted, expensive, and ultimately uncertain contested legal proceeding, in and of itself constitutes significant consideration that will enhance the value of the Debtor's estate and preserve the Debtor's value as a going-concern.

23.     The Debtor believes that an expeditious prosecution of, and emergence from, this chapter 11 proceeding with the support of its Senior Secured Creditor and Firelands under the RSA is essential to preserve the value of its estate and avoid unnecessary administrative expenses from a prolonged process. Without the support of the other Parties, the Debtor would have been forced to file this case as a "free fall" bankruptcy, likely resulting in a devastating amount of costs, complications, and delay, reducing any potential recovery for the Debtor's creditors. More specifically, such disruptions to the Debtor's operations from a non-consensual, protracted bankruptcy process would potentially result in the inability to provide health care services to the Debtor's community of patients. By garnering support from the Senior Secured Creditor and Firelands prior to the Petition Date through the negotiation and ultimate execution of the RSA, the

---

[3] *See, e.g., In re Murray Energy Holdings Co., et al.*, Case No. 19-56885 (JEH) (Bankr. S.D. Ohio Mar. 12, 2020); *see also In re Genco Shipping & Trading Ltd., et al.*, Case No. 14-11108 (SHL) (Bankr. S.D. N.Y. Apr. 25, 2014).

9

Debtor is avoiding major complications and ensuring that the value of its estate is preserved throughout this expedited chapter 11 process.

24.     Given the significant benefits to be gleaned from the consensual transaction set forth in the RSA, the Debtor determined, in the exercise of its reasonable business judgment, that entering into the RSA was in its best interests, and now believes that assumption of the RSA is similarly in its best interests as well as the best interests of its estate. It therefore seeks authority to assume that RSA in this bankruptcy proceeding.

**B.     The Proposed Sale and Bid Procedures**

25.     A critical piece to the RSA, as negotiated by the Parties, involves a marketing process for the sale of the Debtor's assets or the opportunity to be substituted for 100% of the Debtor's membership interests. The Acquisition Price, along with other components of consideration to effect confirmation of TBH's proposed plan of reorganization under section 1129 of the Bankruptcy Code, will serve as Firelands' stalking horse proposal. And, as previously stated, the Debtor has engaged Juniper, subject to Court approval, as its investment banker to undertake the marketing process directed by the RSA.

26.     The RSA sets forth the criteria of an alternative proposal to the stalking horse proposal of Firelands (an "Alternative Transaction Proposal") and process for determining whether an Alternative Transaction Proposal should be deemed a Superior Transaction to Firelands' stalking horse proposal. *See* RSA, § 4(c)(2). In the event an Alternative Proposal Transaction is deemed a Superior Transaction, then the following process is contemplated under the RSA:

> a.     in response to such Alternative Transaction Proposal, Debtor may engage or participate in discussions and negotiations with such person and Senior Secured Creditor regarding such Superior Transaction, *provided further* that (i) Debtor shall provide (A) notice of each Alternative Transaction Proposal to Senior Secured Creditor and Firelands within one business day after the time of receipt of such Alternative Transaction Proposal and (B) a copy of each written

10

Alternative Transaction Proposal, and (ii) Debtor shall thereafter conduct an auction between any party or parties submitting a Superior Transaction and Firelands at a date to be set pursuant to bidding and sale procedures approved by the Bankruptcy Court;

b.      at the conclusion of such auction, to the extent a Superior Transaction, as may have been increased during such auction, shall have been determined by Debtor, in consultation with its professionals and advisors, Senior Secured Lender and its advisors, and any Official Committee of Unsecured Creditors (if any) appointed in the Bankruptcy Case, and its advisors, to be the highest and best bid for the sale of the membership interests of Debtor and/or the assets of Debtor (the "Successful Alternative Bid"), Debtor shall file a Notice of Successful Alternative Bid, and a supplement and amendment to the Plan (to the extent necessary) at least seven (7) days before the Bankruptcy Court's scheduled hearing on Confirmation of the Plan; and

c.      to the extent there is no Successful Alternative Bid, Debtor shall file a Notice of Cancellation of Auction and shall proceed towards pursuing confirmation of the Plan and effectuation of the Restructuring with Firelands.

27.      In order to facilitate the Restructuring as contemplated by the RSA, the Debtor requests approval of the sale and bid procedures set forth below (the "Sale and Bid Procedures"):

a.      Alternative Transaction Proposals must be received on or before **March 28, 2025, at 4:00 p.m. Eastern Time** (the "Bid Deadline").

b.      Upon receipt of an Alternative Transaction Proposal by the Bid Deadline, the Debtor, Fifth Third, any creditor committee, and the UST (together, the "Consultation Parties") will meet and discuss the merit of the various Alternative Transaction Proposals.

c.      In the event there are no Alternative Transaction Proposals other than the Stalking Horse Proposal, the Debtor will file a Notice of Cancellation of Auction and will proceed towards confirming its plan and effectuating the restructuring with Firelands.

d.      To be an Alternative Transaction Proposal that will considered by the Debtor and the Consultation Parties (a "Meritorious Alternative Transaction Proposal") the Proposal must be: (a) definitive and binding, not subject to due diligence or any conditions other than Court approval; (b) accompanied by evidence of financial wherewithal of the proposed buyer or substitute member acceptable to the Debtor in its sole discretion; (c) accompanied by a deposit of immediately available funds of at least ten percent (10%) of the proposed purchase or acquisition price; and (d) accompanied by either a proposed membership substitution agreement substantially similar in form and substance to the MSA,

along with a copy that is redlined against the MSA, or proposed form of asset purchase agreement ("APA") for substantially all of the Debtor's assets.

e.  Any Meritorious Alternative Transaction Proposal must be high enough to meet the initial overbid requirements (the "Overbid Requirements"). The Overbid Requirements require any Meritorious Alternative Transaction Proposal to match the Acquisition Price set forth in the RSA, plus an amount equal to pay the outstanding balance owed Firelands' on the DIP Facility and the Stalking Horse Fee (not to exceed $600,000), plus an additional sum of at least $100,000 in additional value.

f.  Meritorious Alternative Transaction Proposals must include provisions for the payment by the bidder of any cure costs for any executory contract to be assumed at closing.

g.  By **March 31, 2025, at 5:00 p.m. Eastern Time**, the Consultation Parties will select a Meritorious Alternative Transaction Proposal, if received, as the highest and best offer as of the Bid Deadline (the "Starting Overbid"). At that time, the Debtor will notify all parties making Meritorious Alternative Transaction Proposals, the Consultation Parties, the UST, and the Senior Secured Creditor of the Starting Overbid.

h.  If in response to such notification the Debtor thereafter receives a Meritorious Alternative Transaction Proposal that complies with the Overbid Requirements, then the Debtor through its Investment Banker will conduct an auction (the "Auction"), beginning with the terms of the Starting Overbid.

i.  The Auction, if necessary, will be conducted on **April 2, 2025**, at a time and location to be determined by the Debtor and its Investment Banker, with notice thereof to be served upon the parties making Meritorious Alternative Transaction Proposals, the Consultation Parties, the UST, and the Senior Secured Lender. The Auction may also be conducted by Zoom or other video conferencing service at the sole discretion of the Debtor and the Investment Banker, provided sufficient notice thereof is given to all parties making Meritorious Alternative Transaction Proposals.

j.  The initial minimum overbid at Auction shall be equal to the Starting Overbid, plus an amount at least $100,000 in additional consideration (the "Initial Subsequent Overbid"). Thereafter, each subsequent proposal above the Initial Subsequent Overbid must have a purchase price that exceeds the purchase price of the previous highest bid by at least $50,000 of additional consideration.

k.  The Auction will continue until the Investment Banker, in consultation with the Debtor and its counsel, determines, subject to approval of the Court, that it has received the highest and best proposal for the Debtor's assets or for substitution as the sole member in the Debtor (the "Successful Proposal"), as well as the

next highest and best Subsequent Overbid as the second highest and best offer (the "Reserved Proposal"). The party submitting the Successful Proposal will be the "Successful Party", and the party submitting the Reserved Proposal will be the "Reserve Party".

l.    The Investment Banker will have wide discretion to conduct the Auction in a manner designed to maximize the value of the Debtor's estate.

m.    The Successful Party will provide the Debtor, its Investment Banker, and the Senior Secured Creditor with a plan supplement, if need be, by **April 3, 2025, at 5:00 p.m. Eastern Time**. Failure to provide a plan supplement may result in disqualification of the Successful Proposal.

n.    The Court will conduct a hearing to approve the highest and best proposal received at the Auction on a date convenient to the Court, which the Debtor proposes to be **April 14, 2025** (the "Confirmation Hearing"). At the Confirmation Hearing, the Debtor will seek confirmation of the highest and best Proposal from the Auction, along with its submitted plan supplement where required, and approval of that Successful Proposal for acquisition of the Debtor's assets or substitution of 100% of the membership interests in the Debtor, as may be applicable.

## C.    Approval of the Sale and Bid Procedures

28.    The Sale and Bid Procedures are fair and reasonable and should be approved. The Sale and Bid Procedures are designed to provide an organized process for the receipt and review of bids from potential purchasers with an ability to close on the sale of the Debtor's assets or the substitution as the sole member in the Debtor, and to maximize value to the Debtor's estate.

29.    The Sale and Bid Procedures contemplate a timeline for the solicitation of competing proposals, identification of potential parties, submission of Alternative Transaction Proposals, the timing of an Auction, and the scheduling of a Confirmation Hearing. The Investment Banker anticipates beginning the search for potential acquirors even prior to the Court's approval of the Sale and Bid Procedures, if only to solicit interest and ensure that there has been adequate exposure of the Debtor's operations and assets to the market.

13

30. The Debtor requests that the Auction (if there is more than one Meritorious Alternative Transaction Proposal) be scheduled for **April 2, 2025**. The requested timing strikes an appropriate balance between affording potential interested parties a sufficient opportunity to perform due diligence and make their resultant proposals while not unduly prolonging the process.

31. A debtor in possession may sell, after notice and a hearing, its assets outside the ordinary course of business. *See* 11 U.S.C. § 363(b)(1). Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the proffered purchase price is the highest and best offer under the circumstances of the case. *See In re Corbett*, 2018 WL 832885, at *15 (Bankr. D. Mass. Feb. 12, 2018), citing *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-565 (8th Cir. 1997) (holding that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Quaker City Castings, Inc.*, 337 B.R. 729, at *7 (6th Cir. B.A.P. 2005), citing *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("When a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold."). To that end, the Sale and Bid Procedures must "facilitate an open and fair public sale designed to maximize value for the estate." *In re Cormier*, 382 B.R. 377, 388 (Bankr. W.D. Mich. 2008), citing *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also Consol Energy, Inc. v. Murray Energy Holdings Co., et al. (In re Murray Energy Holdings Co.)*, 624 B.R. 606, 610 (6th Cir. B.A.P. 2021) ("…the stalking horse bid presented the sole viable path forward to sell the assets as a going concern to maximize value for Debtors' estates.").

32. The Sale and Bid Procedures will help ensure the Debtor receives the highest or otherwise best offer in an open marketplace and will maximize the value of the Debtor's estate. The implementation of competitive procedures to facilitate the sale of a debtor's assets outside of

25-30191-maw    Doc 75    FILED 02/10/25    ENTERED 02/10/25 23:29:54    Page 14 of 49

the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.[4] The adoption of the Sale and Bid Procedures will properly subject the Debtor's assets and operations to competitive bidding while preserving the proposal of Firelands as reflected in the RSA, thereby providing a floor valuation for the Debtor as a going-concern.

## V.      NOTICE

33.      Notice of this motion is being provided to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Senior Secured Creditor; (c) Firelands; (d) the Debtor's twenty (20) largest unsecured creditors; and (e) any other lienholders. The Debtor submits that, considering the nature of the relief requested, no further notice need be given.

## VI.     CONCLUSION

Based upon the foregoing, the Debtor respectfully requests that the Court enter an order granting the relief requested herein, including authorizing the Debtor to assume the RSA, approving the above referenced procedures to elicit Alternative Transaction Proposals and scheduling an auction, if necessary, as well granting as such other and further relief as is just and proper.

---

[4] *See, e.g., In re PCS & Estimate, LLC*, No. 24-10264 (Bankr. N.D. Ohio May 29, 2024) (approving agreed order on bidding procedures for the sale of substantially all the debtor's assets); *see also In re TOMS King (Ohio), LLC*, No. 23-50001 (Bankr. N.D. Ohio Feb. 2, 2023) (order approving bid procedures); *In re Murray Metallurgical Coal Holdings, LLC, et al.*, No. 20-10390 (Bankr. S.D. Ohio Apr. 13, 2020) (agreed order approving bid procedures).

Respectfully submitted,

 /s/ Richard K. Stovall
Thomas R. Allen        (0017513)
Richard K. Stovall      (0029978)
James A. Coutinho      (0082430)
Andrew D. Rebholz     (0102192)
Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Suite 2400
Columbus, OH 43215
allen@asnalaw.com; stovall@asnalaw.com
coutinho@asnalaw.com; rebholz@asnalaw.com
*Proposed Counsel for Debtor*


The Debtor is separately filing a motion to shorten the response time for this motion pursuant to Bankruptcy Rule 9006(c) and therefore has not included a 14-day notice with this filing. Notice will be separately provided.

16

# EXHIBIT A

# PROPOSED ORDER

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No. 25-30191 |
| The Bellevue Hospital | : | Chapter 11 |
| | : | |
| Debtor. | : | Judge Mary Ann Whipple |

**ORDER GRANTING MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE ASSUMPTION OF THE RESTRUCTURING SUPPORT AGREEMENT, (B) APPROVING BID PROCEDURES AND SCHEDULING AN AUCTION, AND (C) GRANTING RELATED RELIEF (DOC ___)**

This matter comes before the Court on the *Motion for Entry of an Order (A) Authorizing the Assumption of the Restructuring Support Agreement, (B) Approving Bid Procedures and Scheduling an Auction, and (C) Granting Related Relief* (Doc. ___) (the "Motion") filed by The Bellevue Hospital, debtor and debtor in possession (the "Debtor"). Through the Motion, the Debtor seeks (a) authorization for the Debtor to assume the *Restructuring Support Agreement*, dated as of February 5, 2025 (the "Restructuring Support Agreement" or "RSA"), by and among (i) the Debtor, (ii) Fifth Third Bank, National Association ("Fifth Third"), in its capacity as bond holder, issuer of credit cards, and depository bank, (iii) The Bank of New York Mellon Trust Company,

N.A. (the "Master Trustee" and, together with Fifth Third, the "Senior Secured Creditor"), in its capacity as Master Trustee, and (iv) Firelands Regional Health System ("Firelands") in its capacity as secured lender, membership interest holder, and purchaser (collectively, the "Parties"), (b) approval of certain procedures to elicit possible Alternative Transaction Proposals[1] and the scheduling of an auction, if necessary, and (c) approval of related relief.

In conjunction with the Motion, the Debtor filed a motion seeking to shorten the notice period for Motion in accordance with Bankruptcy Rule 9006(c). The Court approved the shortened notice period and the noticing agent has filed a certificate of service indicating proper service of the Motion and the order shortening the notice period. Notice of the Motion has been given to the Debtor, the Office of the United States Trustee, the twenty largest unsecured creditors, Fifth Third Bank, First National Bank, any other lienholders, the Debtor's members, and those other parties requesting notice. Notice of the Motion was adequate and no further notice need be given.

Based on the matters contained in the Motion, proper service of the Motion having been completed, and no objection to the Motion having been filed, the Court finds the Motion to be well-taken and it is approved. The Court finds that the assumption of the RSA by the Debtor is in the best interests of the Debtor and the bankruptcy estate, and that further that the Sale and Bid Procedures under which the Debtor seeks to elicit possible Alternative Transaction Proposals is appropriate under the circumstances. In particular, the Court finds that the procedures for determining which bids constitute a Meritorious Alternative Transaction Proposal are appropriate, and that the amount required for deposits, the Overbid Requirements, and the Stalking Horse Fee are appropriate and approved.

It is therefore ORDERED as follows:

---

[1] Capitalized terms not defined herein have the same meaning as set forth in the Motion.

1. The Debtor is authorized to assume the RSA, which assumption shall be deemed effective as of the date of the Motion.

2. Having assumed the RSA, the Debtor shall use its best efforts to comply with the Milestones set forth therein. However, nothing in this order shall be construed as an approval of any relief that the Debtor is to seek in accordance with the RSA or the terms of the Milestones.

3. The Debtor is authorized to proceed with the sale process as outlined in the Motion and shall work with its investment banker to market its business for potential Alternative Transaction Proposals.

4. The proposed Sale and Bid Procedures as set forth in the Motion and which are reproduced on the attached Exhibit 1 are approved in all respects. The lack of reference in this order to any specific term within the Sale and Bid Procedures does not have any effect on their applicability or enforceability. All of the terms of the Sale and Bid Procedures are approved and deemed part of this order.

5. As set forth in the Sale and Bid Procedures, the Court will consider the results of the Auction (if any) at a Confirmation Hearing. The Court will schedule the Confirmation Hearing by separate order.

SO ORDERED

SUBMITTED BY:

/s/ Richard K. Stovall
Thomas R. Allen        (0017513)
Richard K. Stovall     (0029978)
James A. Coutinho      (0082430)
Andrew D. Rebholz      (0102192)
Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Suite 2400
Columbus, OH 43215
allen@asnalaw.com; stovall@asnalaw.com
coutinho@asnalaw.com; rebholz@asnalaw.com

3

*Proposed Counsel for Debtor*

4

**EXHIBIT 1**

**Sale and Bid Procedures**

Capitalized terms have the meaning set forth in the *Motion for Entry of an Order (A) Authorizing the Assumption of the Restructuring Support Agreement, (B) Approving Bid Procedures and Scheduling an Auction, and (C) Granting Related Relief* (the "Motion") (Doc. ___). A copy of the Motion is available at https://restructuring.ra.kroll.com/bellevue/.

a.    Alternative Transaction Proposals must be received on or before **March 28, 2025, at 4:00 p.m. Eastern Time** (the "Bid Deadline").

b.    Upon receipt of an Alternative Transaction Proposal by the Bid Deadline, the Debtor, Fifth Third, any creditor committee, and the UST (together, the "Consultation Parties") will meet and discuss the merit of the various Alternative Transaction Proposals.

c.    In the event there are no Alternative Transaction Proposals other than the Stalking Horse Proposal, the Debtor will file a Notice of Cancellation of Auction and will proceed towards confirming its plan and effectuating the restructuring with Firelands.

d.    To be an Alternative Transaction Proposal that will considered by the Debtor and the Consultation Parties (a "Meritorious Alternative Transaction Proposal") the Proposal must be: (a) definitive and binding, not subject to due diligence or any conditions other than Court approval; (b) accompanied by evidence of financial wherewithal of the proposed buyer or substitute member acceptable to the Debtor in its sole discretion; (c) accompanied by a deposit of immediately available funds of at least ten percent (10%) of the proposed purchase or acquisition price; and (d) accompanied by either a proposed membership substitution agreement substantially similar in form and substance to the MSA, along with a copy that is redlined against the MSA, or proposed form of asset purchase agreement ("APA") for substantially all of the Debtor's assets.

e.    Any Meritorious Alternative Transaction Proposal must be high enough to meet the initial overbid requirements (the "Overbid Requirements"). The Overbid Requirements require any Meritorious Alternative Transaction Proposal to match the Acquisition Price set forth in the RSA, plus an amount equal to pay the outstanding balance owed Firelands' on the DIP Facility and the Stalking Horse Fee (not to exceed $600,000), plus an additional sum of at least $100,000 in additional value.

f.    Meritorious Alternative Transaction Proposals must include provisions for the payment by the bidder of any cure costs for any executory contract to be assumed at closing.

g.    By **March 31, 2025, at 5:00 p.m. Eastern Time**, the Consultation Parties will select a Meritorious Alternative Transaction Proposal, if received, as the highest and best offer as of the Bid Deadline (the "Starting Overbid"). At that time, the Debtor will notify all parties making Meritorious Alternative Transaction Proposals, the Consultation Parties, the UST, and the Senior Secured Creditor of the Starting Overbid.

h.     If in response to such notification the Debtor thereafter receives a Meritorious Alternative Transaction Proposal that complies with the Overbid Requirements, then the Debtor through its Investment Banker will conduct an auction (the "Auction"), beginning with the terms of the Starting Overbid.

i.     The Auction, if necessary, will be conducted on **April 2, 2025**, at a time and location to be determined by the Debtor and its Investment Banker, with notice thereof to be served upon the parties making Meritorious Alternative Transaction Proposals, the Consultation Parties, the UST, and the Senior Secured Lender. The Auction may also be conducted by Zoom or other video conferencing service at the sole discretion of the Debtor and the Investment Banker, provided sufficient notice thereof is given to all parties making Meritorious Alternative Transaction Proposals.

j.     The initial minimum overbid at Auction shall be equal to the Starting Overbid, plus an amount at least $100,000 in additional consideration (the "Initial Subsequent Overbid"). Thereafter, each subsequent proposal above the Initial Subsequent Overbid must have a purchase price that exceeds the purchase price of the previous highest bid by at least $50,000 of additional consideration.

k.     The Auction will continue until the Investment Banker, in consultation with the Debtor and its counsel, determines, subject to approval of the Court, that it has received the highest and best proposal for the Debtor's assets or for substitution as the sole member in the Debtor (the "Successful Proposal"), as well as the next highest and best Subsequent Overbid as the second highest and best offer (the "Reserved Proposal"). The party submitting the Successful Proposal will be the "Successful Party", and the party submitting the Reserved Proposal will be the "Reserve Party".

l.     The Investment Banker will have wide discretion to conduct the Auction in a manner designed to maximize the value of the Debtor's estate.

m.     The Successful Party will provide the Debtor, its Investment Banker, and the Senior Secured Creditor with a plan supplement, if need be, by **April 3, 2025, at 5:00 p.m. Eastern Time**. Failure to provide a plan supplement may result in disqualification of the Successful Proposal.

n.     The Court will conduct a hearing to approve the highest and best proposal received at the Auction on a date convenient to the Court, which the Debtor proposes to be **April 14, 2025** (the "Confirmation Hearing"). At the Confirmation Hearing, the Debtor will seek confirmation of the highest and best Proposal from the Auction, along with its submitted plan supplement where required, and approval of that Successful Proposal for acquisition of the Debtor's assets or substitution of 100% of the membership interests in the Debtor, as may be applicable.

# EXHIBIT B

# RESTRUCTURING SUPPORT AGREEMENT

## RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (this "**Agreement**"), dated as of February 4, 2025, is entered into by and among The Bellevue Hospital ("**TBH**" or the "**Debtor**"), an Ohio non-profit corporation, Fifth Third Bank, National Association ("**Fifth Third**"), a national banking association in its capacity as bond holder, issuer of credit cards and depository bank, The Bank of New York Mellon Trust Company, N.A. (the "**Master Trustee**" and together with Fifth Third, collectively, the "**Senior Secured Creditor**"), a national banking association, in its capacity as Master Trustee, and Firelands Regional Health System ("**Firelands**"), an Ohio non-profit corporation, in its capacity as secured lender, membership interest holder, and purchaser (collectively, the "**Parties**" and each individually, a "**Party**").

## RECITALS

**WHEREAS,** TBH is indebted to Master Trustee and Fifth Third pursuant to, among other things: (a) that certain Master Trust Indenture, dated as of July 1, 2003, by and between Master Trustee (as successor in trust to Fifth Third) and TBH who is the sole Obligated Issuer[1] thereunder and sole member of the Obligated Group bound thereby, as supplemented, amended or otherwise modified from time to time (as amended, supplemented or otherwise modified from time to time, the "**Indenture**"); and (b) certain Obligations issued under and made pursuant to the Indenture, including: (i) Obligation No. 6, dated as of August 28, 2012, made by TBH to Fifth Third in the original principal amount of $10,000,000, (ii) Obligation No. 7, dated as of September 12, 2012, made by TBH to Fifth Third in the original principal amount of $8,500,000, (iii) Obligation No. 8, dated as of October 3, 2012, made by TBH to Fifth Third in the original principal amount of $2,569,152.82, and (iv) Obligation No. 9, dated as of November 30, 2017, made by TBH to Fifth Third in the original principal amount of $9,000,000 (collectively with all other amount owed by TBH and its affiliates and subsidiaries to Fifth Third, the "**Senior Obligations**");

**WHEREAS,** the Senior Obligations are secured by (a) first-priority mortgage liens on certain of TBH's real estate, including the hospital facilities located at 1400 West Main Street, Bellevue, Ohio 44811, and an office building located at 102 Commerce Park Drive, Bellevue, Ohio 44811 (together, the "**Real Estate Collateral**"); and (b) first priority liens and security interests in substantially all of TBH's tangible and intangible personal property (collectively, the "**Personal Property Collateral**" and together with the Real Estate Collateral, the "**Senior Collateral**"), including all of TBH's accounts, accounts receivables, cash, and cash equivalents, including Employee Retention Credit tax credits ("**ERC Funds**") and Federal Emergency Management Agency grants (the "**FEMA Grants**" and together with the ERC Funds, the "**Government Receivables**") for which applications for payment have been submitted by TBH to the Internal Revenue Service and the Federal Emergency Management Agency (collectively, the "**Cash Collateral**"). The Cash Collateral includes approximately $2,400,000 (the "**Pledged Funds**") of TBH's funds on deposit with LPL Financial, LLC (collectively, the "**Pledged Accounts**"), which such Pledged Funds are (a) subject to a Pledge Agreement dated as of March 27, 2024, by and between TBH and the Master Trustee for the Benefit of Fifth Third; and (b) subject to Master Trustee's control pursuant to one or more control agreements;

---

[1] Capitalized terms used but not otherwise defined in this recital shall have the meanings given to them in the Indenture (defined herein).

1

**WHEREAS**, as of the Effective Date (defined below), the outstanding principal balance of the Senior Obligations is $17,331,975.54, exclusive of accrued and unpaid interest, fees, costs and expenses (including attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Indenture or any other loan document relating to the Senior Obligations);

**WHEREAS**, pursuant to that certain Definitive Agreement (the "**Definitive Agreement**") executed in December, 2002, by, between, and among TBH, The Bellevue Hospital Association, Firelands, and Norwalk Area Health Systems, Inc. ("**NAHS**"), Firelands and NAHS each invested in TBH in exchange for each acquiring a 20% membership interest in TBH;

**WHEREAS**, pursuant to that certain Promissory Note (Non-Revolving Credit) (the "**Firelands' Note**"), TBH is indebted to Firelands in the original principal amount of $800,000 (the "**Firelands' Obligations**"). The Firelands' Obligations are secured by a pledge and security interest in: (a) twenty-five (25) units in The Firelands-Bellevue Real Estate Holding Company, LLC and (b) twenty-five (25) units in The Firelands Bellevue Urgent Care Operating Company, LLC (together, the "**Firelands' Collateral**");

**WHEREAS**, as of the Effective Date, the outstanding principal balance of the Firelands' Obligations is $800,000.00, exclusive of accrued and unpaid interest, fees, costs and expenses (including attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Firelands' Note or any other loan document relating to the Firelands' Obligations);

**WHEREAS**, in July 2024, after having previously defaulting on certain covenants under the Senior Obligations, TBH began facing additional liquidity challenges that raised concerns about its ability to remain a going concern. TBH retained VMG Health ("**VMG**") as its strategic advisor first to advise it as to its future strategic direction. VMG's analysis and assessment concluded that TBH's financial condition presented a serious challenge to its ability to remain an independent organization and recommended the most reasonable course of action was for TBH to seek an acquisition partner. In the fall of 2024, TBH then authorized VMG to further to implement a marketing process targeted to local, regional and national health care systems with identifiable strategic or geographical interest, including both TBH minority interest owners, as part of a request for proposal and eventual sale or other transaction;

**WHEREAS**, on or about November 7, 2024, after soliciting bids based on a set of objective criteria and conducting marketing efforts to seek proposals for the acquisition of TBH, VMG and TBH identified Firelands as the likely potential purchaser of the assets or membership interest of TBH using a set of objective criteria to inform its decision. On November 12, 2024, TBH approved entering into a due diligence process with Firelands toward the goal of restructuring TBH through a sale of its assets or a member substitution in a chapter 11 bankruptcy proceeding;

**WHEREAS**, Firelands, TBH, and Senior Secured Creditor have engaged in good faith, arm's length negotiations regarding the terms by which Firelands would be substituted as the sole holder of all of the membership interests in TBH, together with a settlement of the Senior

2

Obligations, to be accomplished through a chapter 11 plan of reorganization (the "**Plan**") to be filed in a chapter 11 bankruptcy case (the "**Bankruptcy Case**") to be filed in the United States Bankruptcy Court for the Northern District of Ohio, Western Division (the "**Bankruptcy Court**"), which such Plan shall include the restructuring of the Debtor's indebtedness and other obligations, including the Senior Obligations and the Firelands' Obligations pursuant to the agreement reflected herein (such restructuring and any related transactions, the "**Restructuring**");

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment for a Plan of Reorganization that will accomplish the Restructuring subject to this Agreement among Parties as set forth herein, including the substitution of Firelands as the sole holder of all membership interests in TBH, and settlement of the Senior Obligations.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.** **Conditions to Effectiveness.** This Agreement shall become effective as to, and binding upon, each of the undersigned Parties on the date and at the time which all of the following conditions have been satisfied in accordance with this Agreement (such date, the "**Effective Date**"):

(a)    The Pledged Funds shall have been transferred from the Pledged Accounts to a blocked account held at, and subject to possession and control of, Fifth Third, subject to release in accordance with the terms of this Agreement and the DIP Financing Order (defined herein); and

(b)    Counsel for TBH shall have received executed counterparts of this Agreement by each of (i) TBH; (ii) Firelands; (iii) Fifth Third; and (iv) Master Trustee.

**Section 2.** **Restructuring Documents**. The Restructuring Documents governing the Restructuring shall consist of the following and any other material document contemplated by the Parties needed or utilized to implement, govern, or consummate the Restructuring (collectively, the "**Restructuring Documents**"):

(a)    the disclosure statement and any supplement thereto (and all exhibits and other documents and instruments related thereto) with respect to the Plan (the "**Disclosure Statement**");

(b)    to the extent applicable, the order approving (or conditionally approving) the Disclosure Statement or approving any supplement thereto, including the form of ballots and other solicitation materials in respect of the Plan, to the extent required (the "**Disclosure Statement Order**") and, such solicitation materials (the "**Solicitation Materials**");

(c)    the motion to approve TBH's assumption of this Agreement (the "**RSA Assumption Motion**");

(d)     the order approving the RSA Assumption Motion (the "**RSA Assumption Order**");

(e)     the Plan and all documents, annexes, schedules, exhibits, amendments, modifications, and/or supplements thereto, or other documents contained therein, including any schedules of assumed or rejected contracts, to the extent identifiable but subject to amendment and supplementation;

(f)     the order confirming the Plan (the "**Confirmation Order**"), and any pleadings filed by the Debtor in support of the Bankruptcy Court's entry of the Confirmation Order;

(g)     the interim and final orders approving TBH's motion for an order authorizing the TBH to (i) obtain post-petition financing from Firelands, (ii) use the Cash Collateral; and (iii) providing adequate protection to Senior Secured Creditor, and any supplement or attachment thereto, including any credit agreement memorializing the terms of the post-petition financing (together, "**DIP Financing Order**"), incorporating the terms set forth in the DIP Financing Term Sheet (defined below);

(h)     the membership substitution agreement and any other documents or agreements relating to the Firelands' purchase of membership interest in the reorganized debtor (the "**MSA**");

(i)     the motions filed by TBH seeking approval of each of the above (if applicable); and

(j)     any order approving any of the above not otherwise noted.

As of the Effective Date, the Restructuring Documents remain subject to negotiation and, upon completion, all Restructuring Documents shall (a) reflect and contain the terms, conditions, representations, warranties, and covenants set forth in this Agreement, as they may be modified, amended, or supplemented in accordance with Section 7 hereof, and (b) otherwise be in form and substance acceptable to TBH, Firelands, and the Senior Secured Creditor.

**Section 3.     Milestones**. The following milestones (the "**Milestones**") shall apply to this Agreement, which in each case can be extended in writing by the Parties (electronic mail among counsel is sufficient):

(a)     no later than February 5, 2025 (the "**Petition Date**"), TBH shall file a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") thereby commencing the Bankruptcy Case before the Bankruptcy Court;

(b)     no later than one (1) business day after the Petition Date, TBH shall file, in form and substance acceptable to Senior Secured Creditor and Firelands, a motion seeking entry of the DIP Financing Order;

(c)     no later than one (1) business day after the Petition Date, TBH shall file, in form and substance acceptable to Senior Secured Creditor and Firelands, an application seeking authority to retain and employ Juniper Advisory, LLC ("**Juniper**") or such other investment

banker reasonably acceptable to Senior Secured Creditor and Firelands (the "**Investment Banker**"), for the marketing of TBH's assets for sale or substitution as the holder of 100% of the membership interests in TBH;

(d)     no later than two (2) business days after the Petition Date, TBH shall file, in form and substance acceptable to Senior Secured Creditor and Firelands, the RSA Assumption Motion, which motion shall include sale and bid procedures for the marketing of TBH (the "**Sale and Bid Procedures**");

(e)     no later than four (4) business days after the Petition Date, TBH shall file, in form and substance acceptable to Senior Secured Creditor and Firelands, a motion setting forth its proposed confirmation procedures, which motion may include authorization to proceed forward with plan confirmation without soliciting acceptances or rejections of the plan as contemplated under Section 1125 of the Bankruptcy Code (the "**Confirmation Procedures Motion**"), and TBH will seek expedited relief on the Confirmation Procedures Motion;

(f)     no later than February 10, 2025, the Bankruptcy Court shall have entered the DIP Financing Order on an interim basis;

(g)     on or before February 14, 2025, Firelands and TBH shall have executed the MSA, in form and substance acceptable to Senior Secured Creditor, providing for Firelands' acquisition of 100% of the membership interests in TBH for a consideration equal to the amount necessary to (i) provide cash payment of $15,000,000 to Senior Secured Creditor (the "**Cash Payment**") on the Effective Date Deadline (defined below), with such amount not being subject to offset, discount, or adjustment; and (ii) satisfy any other monetary and non-monetary obligations of TBH to satisfy all requirements for confirmation of the Plan in accordance with Section 1129 of the Bankruptcy Code (defined below) as part of a $15,000,000 capital commitment to TBH (collectively with the Cash Payment, the "**Acquisition Price**");

(h)     no later than February 14, 2025, the Bankruptcy Court shall have entered its order, in form and substance acceptable to Senior Secured Creditor and Firelands, approving the Confirmation Procedures Motion;

(i)     no later than the date that is fourteen (14) days after the Petition Date, TBH shall file, in form and substance acceptable to Senior Secured Creditor and Firelands: (i) the Plan and Disclosure Statement, and (ii) any remaining motions required to obtain approval of the Restructuring Documents;

(j)     no later than February 20, 2025, the Bankruptcy Court shall have entered the RSA Assumption Order, in form and substance acceptable to Senior Secured Creditor and Firelands;

(k)     to extent applicable, by no later than February 28, 2025, the Bankruptcy Court shall have entered the Disclosure Statement Order, in form and substance acceptable to Senior Secured Creditor and Firelands, approving the Solicitation Materials;

5

(l)     by no later than February 28, 2025, the Bankruptcy Court shall have entered the DIP Financing Order on a final basis;

(m)     by no later than April 11, 2025, the Bankruptcy Court shall have entered the Confirmation Order; and

(n)     by no later than April 25, 2025, the Plan shall have become effective in accordance with the terms therein (the "**Effective Date Deadline**").

**Section 4.     Commitments of the Parties**.

(a) <u>Firelands' Commitments</u>. Firelands agrees, during the period beginning on the Effective Date and ending on the Termination Date (defined in <u>Section 6</u>) (such period, the "**Effective Period**"), to:

(1)     cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the other Parties and use commercially reasonable and good faith efforts to pursue, support, obtain additional support for, solicit, implement, confirm, and consummate the Restructuring, the Restructuring Documents, and the Plan, and to execute and take all actions contemplated thereby and as reasonably necessary, or as may be required by order of the Bankruptcy Court, to support and achieve consummation of the Restructuring;

(2)     not, directly or indirectly, (i) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring or (ii) solicit, propose, file, support, consent to, encourage, take any action in furtherance of or vote for any Alternative Transaction[2], other than any Superior Transaction (defined below);

(3)     not, directly or indirectly, file any pleading with the Bankruptcy Court or otherwise support, encourage, seek, solicit, pursue, initiate, assist, join or participate in any challenge to the validity, enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of the Senior Obligations and/or any interests in the Senior Collateral;

(4)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in the Plan or in this Agreement, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

---

[2] "**Alternative Transaction**" means any transaction with respect to a plan of reorganization or liquidation, dissolution, winding up, liquidation, reorganization, workout, merger, consolidation, business combination, joint venture, partnership, sale of material assets or membership interests of the Debtor taken as a whole, or restructuring involving the Debtor, without the prior written consent of the Senior Secured Creditor and Firelands that competes with or renders the Restructuring or the Plan unable to be consummated on the terms set forth in the Plan and this Agreement, or would reasonably be expected to materially frustrate the purposes of the Restructuring, the Plan or this Agreement.

6

(5)     except to the extent expressly contemplated under the Plan or this Agreement, not exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any claims against or interests in TBH that it owns or has beneficial ownership of, and any other claims against any direct or indirect subsidiary of TBH;

(6)     promptly (but in any event within three (3) business days) notify TBH and Senior Secured Creditor in writing of the occurrence, or failure to occur, of any event of which Firelands has actual knowledge and with respect to which such occurrence or failure would likely cause (i) any representation of Firelands contained in this Agreement to be untrue or inaccurate in any material respect, (ii) any covenant of Firelands contained in this Agreement to not be satisfied in any material respect, or (iii) any condition precedent contained in the Plan or this Agreement related to the obligations of Firelands to not occur or become impossible to satisfy; *provided* that Firelands shall not be obligated to report the breach or potential breach of this Agreement in order to comply with this Section 4(a)(6);

(7)     execute and deliver such other instruments and perform such acts, in addition to the matters specified herein, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court in connection with the Plan, from time to time, to effect the Restructuring, as applicable;

(8)     pursuant to and in accordance with the MSA, to commit to acquire 100% of the membership interest in the reorganized TBH on the terms set forth in the MSA, and for an amount no less than the Acquisition Price;

(9)     to provide post-petition financing to the TBH on terms acceptable to TBH and Senior Secured Creditor and as set forth in the DIP Financing Term Sheet attached as **Exhibit A** hereto (the "**DIP Financing Term Sheet**");

(10)    to submit drafts to TBH and Senior Secured Creditor of any public press release that discloses the existence or terms of this Agreement, the MSA, the Plan, or any other Restructuring Document (or any amendment to any of the foregoing) and affords TBH and Senior Secured Creditor a reasonable opportunity to comment on such documents and disclosures; and

(11)    to the extent of the Firelands' Obligations and to the extent required,(i) timely vote or cause to vote any and all claims against or interests in TBH to accept the Plan , as required by the Confirmation Procedures and (ii) thereafter, not change or withdraw (or cause to be changed or withdrawn) any such vote or election; *provided* that, notwithstanding anything to the contrary in the Confirmation Procedures, such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by Firelands at any time if this Agreement is terminated.

(b) Senior Secured Creditor' Commitments. Senior Secured Creditor agrees, during the Effective Period to:

7

(1)     cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the other Parties and use commercially reasonable and good faith efforts to pursue, support, obtain additional support for, solicit, implement, confirm, and consummate the Restructuring, the Restructuring Documents, and the Plan, and to execute and take all actions contemplated thereby and as reasonably necessary, or as may be required by order of the Bankruptcy Court, to support and achieve consummation of the Restructuring;

(2)     not, directly or indirectly, (i) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring or (ii) solicit, propose, file, support, consent to, encourage, take any action in furtherance of or vote for any Alternative Transaction, other than any Superior Transaction (defined below) regarding a Successful Alternative Bid (defined below);

(3)     not, directly or indirectly, file any pleading with the Bankruptcy Court or otherwise support, encourage, seek, solicit, pursue, initiate, assist, join or participate in any challenge to the validity, enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of the Firelands' Obligations and/or any interests in the Firelands' Collateral;

(4)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in the Plan or in this Agreement, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(5)     except to the extent expressly contemplated under the Plan or this Agreement, not exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any claims against or interests in TBH that it owns or has beneficial ownership of, and any other claims against any direct or indirect subsidiary of TBH;

(6)     promptly (but in any event within three (3) business days) notify TBH and Firelands in writing of the occurrence, or failure to occur, of any event of which Senior Secured Creditor has actual knowledge and with respect to which such occurrence or failure would likely cause (i) any representation of Senior Secured Creditor contained in this Agreement to be untrue or inaccurate in any material respect, (ii) any covenant of Senior Secured Creditor contained in this Agreement to not be satisfied in any material respect, or (iii) any condition precedent contained in the Plan or this Agreement related to the obligations of Senior Secured Creditor to not occur or become impossible to satisfy; *provided* that Senior Secured Creditor shall not be obligated to report the breach or potential breach of this Agreement in order to comply with this Section 4(b)(6);

(7)     execute and deliver such other instruments and perform such acts, in addition to the matters specified herein, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court in connection with the Plan, from time to time, to effect the Restructuring, as applicable;

(8) to consent to TBH's use of its Cash Collateral on terms acceptable to TBH and Firelands and as set forth in the DIP Financing Term Sheet;

(9) consent to the release of all liens in the Senior Collateral on the Effective Date Deadline upon receipt of cash payment of $15,000,000 of the Acquisition Price; and

(10) to the extent of the Senior Secured Creditor' Obligations, and to the extent required by the Confirmation Procedures, (i) timely vote or cause to vote any and all claims against or interests in TBH to accept the Plan, as required by the Confirmation Procedures and (ii) thereafter, not change or withdraw (or cause to be changed or withdrawn) any such vote or election; *provided* that, notwithstanding anything to the contrary in the Confirmation Procedures, such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by Senior Secured Creditor at any time if this Agreement is terminated.

(c) TBH's Commitments. TBH agrees, during the Effective Period to:

(1) cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the other Parties and use commercially reasonable and good faith efforts to pursue, support, obtain additional support for, solicit, implement, confirm, and consummate the Restructuring, the Restructuring Documents, and the Plan, and to execute and take all actions contemplated thereby and as reasonably necessary, or as may be required by order of the Bankruptcy Court, to support and achieve consummation of the Restructuring;

(2) not, directly or indirectly, (i) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring or (ii) solicit, propose, file, support, consent to, encourage, take any action in furtherance of any Alternative Transaction, other than any Superior Transaction; *provided*, however, notwithstanding anything to the contrary in this Agreement, if, following the Effective Date and prior to entry of the Confirmation Order, TBH receives a bona fide written proposal, expression of interest or offer for an Alternative Transaction which includes evidence of financial and operational ability to perform and does not include any contingencies (an "**Alternative Transaction Proposal**") TBH may communicate with any person that has made an Alternative Transaction Proposal (and its advisors) for the purpose of clarifying the proposal and any terms thereof and whether it could reasonably be expected to materially exceed the Acquisition Price, satisfy the Stalking Horse Fees (defined herein) to Firelands, and repay the post-petition financing extended to TBH under the DIP Financing Order. If TBH determines in good faith, after considering the advice of its counsel, and its Investment Banker, that such Alternative Transaction Proposal constitutes, or could reasonably be expected to result in, a transaction that: (i) would be in the best interests of TBH; (ii) would be in the best interests of holders of claims against TBH, (ii) would reasonably be expected to provide each class of creditors either treatment sufficient to not impair the claims in such class or to provide distributions with a value materially in excess of the distributions provided to such class under the transactions contemplated under this Agreement and the Plan, and (iii) is at least as feasible

and as likely to achieve confirmation and consummation as the transactions contemplated under this Agreement and the Plan (a "**Superior Transaction**"), TBH may, in response to such Alternative Transaction Proposal, engage or participate in discussions and negotiations with such person and Senior Secured Creditor regarding such Superior Transaction; *provided, further*, that, , (i) TBH shall provide (A) notice of each Alternative Transaction Proposal to Senior Secured Creditor and Firelands within one business day after the time of receipt of such Alternative Transaction Proposal and (B) a copy of each written Alternative Transaction Proposal, and ii) TBH shall thereafter conduct an auction between any party or parties submitting a Superior Transaction and Firelands at a date to be set pursuant to bidding and sale procedures approved by the Bankruptcy Court. At the conclusion of such auction, to the extent a Superior Transaction, as may have been increased during such auction, shall have been determined by TBH, in consultation with its professionals and advisors, Senior Secured Lender and its advisors, and any Official Committee of Unsecured Creditors (if any) appointed in the Bankruptcy Case, and its advisors, to be the highest and best bid for the sale of the membership interests of TBH and/or the assets of TBH (the "**Successful Alternative Bid**"), TBH shall file a Notice of Successful Alternative Bid, and a supplement and amendment to the Plan (to the extent necessary) at least 7 days before the Bankruptcy Court's scheduled hearing on Confirmation of the Plan. To the extent there is no Successful Alternative Bid, TBH shall file a Notice of Cancelation of Auction and shall proceed towards pursuing confirmation of the Plan and effectuation of the Restructuring;

(3)     not, directly or indirectly, file any pleading with the Bankruptcy Court or otherwise support, encourage, seek, solicit, pursue, initiate, assist, join or participate in any challenge to the validity, enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of the Senior Obligations, the Firelands' Obligations and/or any interests in the Senior Collateral or the Firelands' Collateral;

(4)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in the Plan or in this Agreement, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(5)     promptly (but in any event within three (3) business days) notify Firelands and Senior Secured Creditor in writing of the occurrence, or failure to occur, of any event of which TBH has actual knowledge and with respect to which such occurrence or failure would likely cause (i) any representation of TBH contained in this Agreement to be untrue or inaccurate in any material respect, (ii) any covenant of TBH contained in this Agreement to not be satisfied in any material respect, or (iii) any condition precedent contained in the Plan or this Agreement related to the obligations of TBH to not occur or become impossible to satisfy; *provided* that TBH shall not be obligated to report the breach or potential breach of this Agreement in order to comply with this Section 4(c)(5);

(6)     execute and deliver such other instruments and perform such acts, in addition to the matters specified herein, as may be reasonably appropriate or necessary, or

as may be required by order of the Bankruptcy Court in connection with the Plan, from time to time, to effect the Restructuring, as applicable;

(7)  use commercially reasonable efforts to act in a manner to satisfy each of the Milestones set forth in Section 3 of this Agreement;

(8)  provide advance initial draft copies of each Restructuring Document and any pleading relating to the Plan, the Disclosure Statement plan exclusivity, assumption or rejection of material executory contracts and unexpired leases, or key employee incentive or retention plan to Senior Secured Creditor and Firelands, no later than two (2) calendar days prior to the date when TBH intends to file such pleading or Restructuring Document with the Bankruptcy Court and consult in good faith with Senior Secured Creditor and Firelands regarding the form and substance of any such filing, in each case to the extent reasonably practicable or otherwise as soon as reasonably practicable prior to such filing;

(9)  timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (i) directing the appointment of a trustee or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, (ii) converting Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, (iii) dismissing the Bankruptcy Case, or (iv) modifying or terminating TBH's exclusive right to file and/or solicit acceptances of the Plan;

(10)  timely oppose any motion, application, or request filed with the Bankruptcy Court seeking approval of any Alternative Transaction Proposal other than to the extent necessary to seek approval of a Successful Alternative Bid;

(11)  timely oppose any objections filed with the Bankruptcy Court with respect to (A) approval of the RSA Assumption; (B) the Confirmation Procedures Motion or (C) confirmation of the Plan;

(12)  seek to cause the Confirmation Order to become effective and enforceable immediately upon its entry and to seek to have the period in which an appeal thereto must be filed commence immediately upon its entry;

(13)  comply in all material respects with the terms and conditions of the DIP Financing Order;

(14)  not object to, impede or take any other action (including filing any pleading) that is materially inconsistent with, or is intended or is likely to materially interfere with, acceptance or implementation of the Restructuring; and

(15)  not seek to amend or modify, or file a pleading seeking authority to amend or modify, the Restructuring Documents in a manner that is materially inconsistent with this Agreement or the Plan without the prior written consent of Senior Secured Creditor and Firelands.

11

**Section 5.** **Representations and Warranties.** Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the Effective Date, subject in the case of TBH to any required approval by the Bankruptcy Court:

(a) Power and Authority. Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b) No Conflict. The execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(c) No Consent or Approval. The execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body; and

(d) Enforceability. This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

**Section 6.** **Termination Events.** Any Party may terminate this Agreement by delivering to the other Parties upon three (3) business day's written notice in accordance with Section 9(k) hereof, upon the occurrence of any of the following events, in each case after the Effective Date; *provided, however*, that no Party may terminate this Agreement based upon a breach of this Agreement such Party's own actions:

(a) the breach by TBH of any obligation, commitment, agreement, representation, warranty, covenant, or other provision contained in this Agreement in any material respect, which breach (i) would materially and adversely impede or interfere with the overall acceptance, implementation, or consummation of the Restructuring on the terms and conditions set forth in this Agreement and the Plan and (ii) remains uncured for a period of five (5) business days after the receipt by the other Parties of written notice of such breach, other than with respect to any breach that is incurable, for which no cure period shall be required or apply;

12

(b)      (i) the Bankruptcy Court approves or authorizes an Alternative Transaction Proposal, (ii) TBH enters into a contract providing for the consummation of any Superior Transaction regarding a Successful Alternative Bid, or (iii) TBH files any motion or application seeking approval of a Superior Transaction regarding a Successful Alternative Bid;

(c)      the failure by TBH to meet any of the Milestones as a result of the failure by any TBH to use commercially reasonable efforts to reach such Milestone, unless such Milestone is extended by the written agreement of Senior Secured Creditor and Firelands;

(d)      an examiner (other than an independent fee examiner) with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, a trustee, or a receiver shall have been appointed in the Bankruptcy Case;

(e)      TBH withdraws the Plan or the Bankruptcy Court enters an order denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein; *provided* that, for the avoidance of doubt, no Party shall have the right to terminate this Agreement pursuant if the Bankruptcy Court denies confirmation of the Plan subject only to the making of ministerial, administrative, or immaterial modifications to the Plan;

(f)      the (i) conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of the Bankruptcy Case, unless such conversion or dismissal, as applicable, is made with the prior written consent of Firelands and Senior Secured Creditor;

(g)      (i) any of the Restructuring Documents, after completion, contain terms, conditions, representations, warranties, or covenants that are materially inconsistent with the terms of this Agreement, (ii) any of the Restructuring Documents shall have been materially amended or modified in a manner rendering such Restructuring Document materially inconsistent with the terms of this Agreement, in each case, without the consent of the Senior Secured Creditor and Firelands, or (iii) in the case of a Restructuring Document that is also an order (including the Confirmation Order), such order shall have been reversed, vacated or modified in a manner materially inconsistent with this Agreement, without the prior written consent of the Senior Secured Creditor and Firelands, unless TBH has sought a stay of the order causing such reversal, vacatur or modification within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance;

(h)      TBH files a motion seeking authority to enter into post-petition financing agreement without the prior written consent of Senior Secured Creditor and Firelands;

(i)      any Party materially breaches their obligations under this Agreement; and

(j)      the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless TBH has sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed reversed or vacated within ten (10) business days after the date of such issuance.

13

**Section 7.** **Amendments and Waivers.** The terms and conditions of this Agreement, including any exhibits, annexes or schedules to this Agreement, may not be waived, modified, amended, or supplemented without the prior written consent of (i) TBH, (ii) Firelands, (iii) Master Trustee, and (iv) Fifth Third. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by a Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy by such Party. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law. Any consent or waiver contemplated in this Agreement may be provided by electronic mail from counsel to the relevant Parties.

**Section 8.** **Stalking Horse Fees.** Upon closing of a Superior Transaction, TBH shall be obligated to pay to Firelands in cash an amount equal to the reasonable out-of-pocket expenses incurred by Firelands, including reasonable attorneys' fees, relating to the MSA, the Plan, or TBH's Bankruptcy Case (the "**Stalking Horse Fee**") from the proceeds of the Superior Transaction not to exceed $600,000.

**Section 9.** **Miscellaneous.**

(a)    Entire Agreement. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral, or written, among the Parties with respect thereto.

(b)    Headings. The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

(c)    Governing Law; Submission to Jurisdiction; Forum Selection. This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of Ohio, without giving effect to the conflicts of law principles thereof. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court and, to the extent the Bankruptcy Court is determined to not have jurisdiction, in the United States District Court for the Northern District of Ohio or any Ohio State court located in Sandusky County (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto.

(d)    Trial by Jury Waiver. Each Party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or related to this Agreement or the transactions contemplated hereby.

(e)     _Execution of Agreement_. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Each individual executing this Agreement on behalf of a Party has been authorized and empowered to execute and deliver this Agreement on behalf of said Party.

(f)     _Interpretation and Rules of Construction_. This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof. Each Party was represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel and, therefore, waive the application of any law, regulation, holding or rule of construction (i) providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document or (ii) any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel. Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation" and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or." "Writing," "written," and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form, and any requirement that any notice, consent or other information shall be provided "in writing" shall include e-mail. Any reference to "business day" means any day other than a Saturday, a Sunday, or any other day on which banks located in Cleveland, Ohio are closed for business as a result of federal, state or local holiday and any other reference to a day means a calendar day. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

(g)     _Successors and Assigns_. Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective successors, permitted assigns, heirs, executors, administrators, and Representatives.

(h)     _No Third-Party Beneficiaries_. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

(i)     _Reservation of Rights_. If the Restructuring is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this

15

Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring, or determine the payment of damages to which a Party may be entitled under this Agreement.

(j)    Specific Performance; Remedies Cumulative. This Agreement is intended as a binding commitment enforceable in accordance with its terms. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy for any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

(k)    Notices. All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier, or by registered or certified mail (return receipt requested) to the following addresses or electronic mail addresses:

(1)    If to the TBH, to:

The Bellevue Hospital
Attn: Sara Brokaw, President
1400 W. Main Street
Bellevue, Ohio 44811
sbrokaw@bellevuehospital.com

*with a copy to:*

Allen Stovall Neuman & Ashton LLP
Attn: Richard Stovall
10 W. Broad St., Suite 2400
Columbus, Ohio 43215
stovall@asnalaw.com

(2)    If to Firelands, to:

Firelands Regional Medical Center
Attn: Jeremy Normington-Slay
1111 Hayes Avenue
Sandusky, Ohio 44870
NorminJ@Firelands.com
*with a copy to:*

16

Dinsmore & Shohl, LLP
Attn: Ellen Arvin Kennedy
250 W. Main Street
Lexington, KY 40507
Ellen.kennedy@dinsmore.com

(3)     If to Senior Secured Creditor, to:

Fifth Third Bank
Attn: Terick R Hinze
101 N Michigan Ave
MD: H54011
Big Rapids, MI. 49307
terick.hinze@53.com

*with a copy to:*

Vorys, Sater, Seymour and Pease LLP
Attn: Kari B. Coniglio
200 Public Square, Suite 1400
Cleveland, Ohio 44114
kbconiglio@vorys.com

(4)     If to Master Trustee, to:

The Bank of New York Mellon Trust Company
Attn: Gary S. Bush
Senior Vice President
240 Greenwich Street- 7 East
New York, NY 10286gary.bush@bny.com

*with a copy to:*

Fisher Broyles
Attn: Patricia Fugée
27100 Oakmead Drive, #306
Perrysburg, Ohio 43551
Patricia.fugee@fisherbroyles.com

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by facsimile or electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission.

(l)     <u>Acknowledgment</u>. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for

17

the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code, unless otherwise approved by the Bankruptcy Court. Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code, unless otherwise authorized by the Bankruptcy Court .

     (m)   <u>Independent Analysis</u>. Each Party hereby confirms that its decision to execute this Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.

     (n)   <u>TBHs' Fiduciary Obligations</u>. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement, the Plan, or anything included in any Definitive Document shall require TBH or any board of directors, board of managers, or similar governing body of TBH, after consulting with counsel, to take any action or to refrain from taking any action with respect to this Agreement, the Plan, or the Restructuring to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law, and any such action or inaction pursuant to such exercise of fiduciary duties shall not be deemed to constitute a breach of this Agreement; *provided* that TBH shall give prompt written notice to counsel to each of Senior Secured Creditor and Firelands (electronic mail among counsel being sufficient) of any determination made under this <u>Section 9(n)</u>.

*[Remainder of Page Intentionally Left Blank]*

18

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the date set forth above.

**The Bellevue Hospital**

By: *Sara Brokaw*

Name: Sara Brokaw
Title: President

**Firelands Regional Medical Center**

By: _____

Name: Jeremy Normington-Slay

Title: President + CEO

**Fifth Third Bank, National Association**

By:_____

Name: Terick Hinze
Title:  Vice President, Special Assets

**The Bank of New York Mellon Trust Company**, N.A.

By: _Gary S. Bush_

Name: Gary S. Bush

Title: ~~Senior Vice President~~

As Agent

**EXHIBIT A**
**DIP FINANCING TERM SHEET[3]**

| Proposed DIP Structure | |
|---|---|
| Borrower | The Bellevue Hospital |
| Lender | Firelands Regional Medical Center |
| Financing | $1,500,000 revolving line of credit facility in new money financing ("DIP Facility") |
| Collateral Package | Consensual first priority liens and security interests in all real estate owned by TBH other than the Real Estate securing the Senior Obligations; replacement liens on its existing security interest against TBH; and junior liens on all property owned by TBH subject only to the interest of the Senior Secured Creditor |
| Form of Interim and Final DIP Financing Orders | The DIP Financing Orders shall be in form and substance acceptable to Firelands and Senior Secured Creditor in their reasonable discretion and shall include: (1) a standard investigation period and limited challenge period as to the Senior Obligations and Firelands' Obligations; (2) standard bankruptcy events of default; (3) effective as of entry of a final order, waiver of surcharge and marshalling; (4) weekly reporting obligations; and (5) maintenance of all DIP accounts at Fifth Third with no cash maintained at another institution. |
| Carve Out Reserve | $1.55MM Subject to the Budget |
| Sale/Confirmation Milestones | The DIP loan shall be subject to the satisfaction of the timelines and deadlines set out in the Restructuring Support Agreement, to be incorporated into the DIP Financing Order without amendment or extension except as approved by written agreement of Firelands, TBH and Senior Secured Lender, and the satisfaction of such deadlines shall be a condition precedent to any draw against the DIP Loan. |
| Financial Reporting | |
| Cash Flow Reporting | Customary cash flow reporting with roll forward and analysis |
| Financial Reporting Frequency | Budget compliance, variance reporting weekly |
| Negotiated Items | |
| Availability | Drawdowns under the DIP shall be available on the following basis: |

---

[3] Capitalized terms not defined herein shall have the meanings given to them in the Restructuring Support Agreement.

A-1

| | No more than one drawdown shall be available in any one-week period.<br><br>Borrower shall submit a drawdown request to the Lender at least four business days (or shorter if the parties may agree) before the date of the funding.<br><br>Prior to any drawdown, the Borrower must have submitted to the Lender an updated cash flow forecast commencing in the immediately preceding week. |
|---|---|
| **Payment Conditions** | Upon Effective Date of Plan, unless otherwise agreed by Lender, Borrower shall repay in full in cash the outstanding balance of the DIP Facility. |
| **Blocked Collateral Account** | Borrower shall maintain an blocked collateral account with Fifth Third at all times containing a minimum balance of $150,000, which such funds shall secure immediate repayment of Borrower's credit card with Fifth Third. The DIP Financing Order shall provide Fifth Third with the right to setoff the funds in the blocked collateral account and apply the same towards satisfaction of Borrower's credit card obligations at any time. If the funds in the blocked collateral account are less than $150,000, Fifth Third shall, at its option, reduce the availability on the credit card to the amount on deposit in the blocked collateral account, or may terminate authorization for continued use of the credit card. |
| **Events of Default** | Standard and customary bankruptcy and sale/confirmation process events of default to be mutually agreed |
| **Pricing / Contract Terms** | |
| **Maturity Date** | The DIP Facility shall mature upon the earliest of (a) the Effective Date of the Borrower's Plan, and (b) the termination of the DIP Facility at DIP Lender's election, upon an event of default under the DIP Credit Agreement or other DIP loan documents |
| **Interest Rate** | Wall Street Journal Prime Variable Rate |
| **Incremental Default Rate** | 2.00% |
| **Adequate Protection – Cash Collateral** | |
| **Cash Collateral Usage** | Pledged Funds shall be released to Borrower for use in compliance with Budget approved in form and substance by Senior Secured Creditor and Firelands, subject to termination, with requests for release of |

| | |
|---|---|
| | Pledged Funds to come no more than once per week, and on no less than two (2) business days' notice.<br><br>All other Cash Collateral, including the Government Receivables, shall be used by Borrower in compliance with Budget approved in form and substance by Senior Secured Creditor and Firelands, subject to termination. |
| **Adequate Protection - Reporting** | Senior Secured Creditor shall be entitled to all financial reporting provided to Firelands.<br><br>Use of Cash Collateral terminates on standard triggers, including impermissible budget variances. |
| **Adequate Protection Liens** | (1) First-Priority Replacement Lien on all Cash Collateral; (2) Lien on all Avoidance Actions solely to the extent of diminution; (3) junior lien (subordinated only to Firelands on the DIP Facility) on any real estate securing the DIP Facility |
| **Additional Adequate Protection** | Senior Secured Creditor shall be a "Consultation Party" for any sale or Plan related items. |
| **Automated Clearing House (ACH)** | Upon the Petition Date, Debtor's ACH liabilities shall be "prefund" only and no ACH transfers from TBH's accounts with Fifth Third may be debited for ACH unless such account has sufficient funds to satisfy such ACH at the time such transfer is initiated. |

A-3